Boring-, J.,
dissenting:
The proclamation of the President of 16th August, 1861, prohibited commercial intercourse between the inhabitants of the loyal States and the inhabitants of she States it declared in insurrection, except as to such parts of the latter “ as may be, from time to time, occupied and controlled by forces of the United States,” &c. Such parts so occupied and controlled were thus made loyal territory, and had its rights and disabilities under the proclamation, for their inhabitants could trade with the loyal and could not trade with the disloyal States. But this was the effect of the exception in the proclamation and not of the military occupation, because the exception attached this effect to the military occupation which it would not have had otherwise, for military occupation is mere force and has no power in itself to determine the political relations of the government or the civil rights and status of the people. For neither our law or the common law, or the law of nations, gives it any such power. When the G-erman armies occupied a French city, such military occupation did not make the inhabitants of that *289 city Germans, or alter their relations to their fellow-citizens or the government of France. And when the forces of the Confederacy occupied a town in the State of Pennsylvania, its inhabitants were still citizens of that loyal State, and as such could, under the proclamation, trade in that and other loyal States, and could not trade in the States in insurrection. So when our forces occupied a city in the States in insurrection, such military occupation had no legal effect on the rights of the citizens to commercial intercourse, and its only effect was to bring the city within the exception that governed such commercial intercourse. There is a wide difference between the law which governs a subject and the circumstance which brings the law into operation; and the military occupation was only such circumstance, while the exception, as part of a proclamation made by virtue of an act of Congress, was the law that governed the subject. To compress what I have said into a single sentence, if the prohibition as to commercial intercourse between the loyal and disloyal States had been absolute, the military occupation of itself could not have made any exception to it.
' As the proclamation of 16th August, 1861, declared the State of Tennessee in insurrection, thereafter its inhabitants could not trade in the loyal States, and could trade in the States of insurrection, until June 6,1862, when the capture of Memphis brought it within the exception of the proclamation, and its inhabitants could then trade in the loyal States and could not trade in the disloyal States. But, as 1 have said, this was the effect of the exception as to military occupation; and by the proclamation of 1863 the exception was revoked, and (as it was expressly declared) ‘‘because it embarrassed the due enforcement of the act of 13th July, 1863, and the proper regulation of the commercial intercourse authorized by it.” And after the revocation of the exception for this cause, to give to military occupation any effect on commercial intercourse would be to disobey the proclamation of 1863 and defeat its purpose. And after the exception was revoked it was as utterly inefficient for all purposes as if it had never been made; and then the prohibition as to commercial intercourse between the loyal and disloyal States was absolute and unqualified. Moreover, the proclamation of 1863, after revoking the exception as to military occut>ation, in express terms reenacted the prohibition as to commercial intercourse between the loyal and disloyal States; so that under both *290 proclamations all Tennessee was in insurrection, and Memphis,, notwithstanding its military occupation, was no long’er excepted j, and the petitioner, as an inhabitant of Tennessee and of Memphis, was, irrespective of his personal loyalty or disloyalty, by the proclamations, excluded from commerce and citizenship with the inhabitants of the loyal States, and forced into citizenship with the inhabitants of the disloyal States. Our laws made-him their confederate because of his locality; and then his commercial intercourse with them was not prohibited by the proclamations, but permitted by them. Neither was it prohibited by the common law, whose rules in this case coincide with the-proclamations as to commercial intercourse. In 1862 the Supreme Court, in the prize eases, (2 Black, 265,) decided that from 1861 there was between the United States and the Confederate States a territorial war $ that the two governments, were belligerents; that the territory of the Confederate States was enemy’s territory, and the property of its people subject to capture jure belli. And, as has been said, neither by the common law nor the law of nations does the military occupation of a portion of enemy’s territory1 alter its hostile character or the relations of its people to their own government or to the government whose forces hold it. Mere military occupation, therefore, had no power to reconstruct an insurrectionary State, or any part of it; and this was conclusively established for this case by the joint resolution of Congress of 24th July, 1866, “restoring Tennessee to her relations to the TJnion; ” for that resolution declared in terms that such restoration could only be made “by the consent of the law-making power of the United States.”' And it has been said that the proclamation of 1863 revoked the exception as to military occupation, and made the prohibition of commercial intercourse between the loyal and disloyal States absolute and unqiialified, and expressly reenacted it in that form as to all Tennessee. And I think, as a consequence of all this, that in 1864 'all Tennessee (and Memphis as a part of it), was enemy’s territory, and that the petitioner, as am inhabitant of it, could not trade in the loyal and could trade in the disloyal States by the rule of the common law and by the proclamations; and that it was lawful for him either personally’- or by agent, under a passport from our military authority holding Memphis, to leave it and go into Alabama and trade there.
For the same reasons I think the case of The United States v. *291 Grossmeyer (9 Wal., p. 72) is not applicable here; for in that case one of the parties was an inhabitant of a loyal State, and. the other of a disloyal State, while here, I think, each of the parties was an inhabitant of a disloyal State.
Then, as to the sale of negroes for confederate money. It is-claimed that this proved and was an act of disloyalty within the third section of Act 12th March, 1863. Certainly no intent-to aid the rebellion can be inferred from such sale, because it was an ordinary business transaction of its locality, and entered into for profit, and, as the counsel for the defendants states, for speculative purposes. And so far as it was a sale, for confederate money, between two citizens of the Confederate States, in which property and price changed hands between them, it is obvious that it could no more- give aid and comfort to the rebellion than any other sale in the Confederacy, as, for instance, the sales of cotton for confederate money, which we adjudge good between citizens of the Confederate States every day.
• And so far as it was a sale of negroes, it was a valid sale when and where it was made; for slavery was not abolished till the 18th of December, 1865. Then the thirteenth amendment to the Constitution of the United States went into effect. And until 1865 slaves were property, and vendible in Alabama, where the vendee lived, and in Tennessee, where the vendor lived.
It is true that the President, by his proclamation of January 1^1863, declared that therefrom all slaves in States in insurrection were free, but I think it is not competent to executive or legislative power to abolish slavery, but that that is for the sovereign power exercised by the people and declared in the Constitution: and that, therefore, an amendment to the Constitution was necessary to abolish slavery, and that it was not abolished till the thirteenth amendment to the Constitution was made. And that that amendment was made to the Constitution of the United States, and that the States restored to the Union after the war were required to abolish slavery by provisions in their constitutions, are authoritative declarations that slavery could only be abolished by such constitutional provisions. And in the case of Prigg v. The Commonwealth of Pennsylvania, (16 Peters, 540,) the Supreme Court said that the Constitution contemplated “the existence of a positive, unqualified right on the part of the owner of a slave.” And a right recognized by the Constitution is maintained by it, and cannot *292 be destroyed or impaired by any other authority. And the exercise of such a right cannot be imputed to any man as 'an act or as evidence of disloyalty.
Our jurisprudence recognizes and declares the existence of certain absolute rights which are natural, inherent, and indefeasible; and among them is the right to acquire and enjoy property. And it is manifest that the power to say in what things this natural right may or may not subsist is the power to control and destroy it. For if legislative or executive authority may say it shall not subsist in any particular thing, it may say the same as to every other thing, and thus destroy the natural right altogether. And the power that may destroy one natural right may destroy all, and such a power the people had not delegated to the government.
, On the whole case, I am of opinion that the claimant is entitled to judgment for the net proceeds of the cotton claimed by him.